### AMES MERCANTILE CO. v. KIMBALL S. S. CO.

(District Court, N. D. California. September 18, 1903.)

#### No. 12,437.

1. SHIPPING—CONSTRUCTION OF BILL OF LADING—DELIVERY OF GOODS.

A bill of lading issued by a steamship company for goods to be transported from San Francisco to Nome contained the following clause: "It is expressly understood that the above-mentioned merchandise shall, at the option of said company, be received by the consignee thereof at the vessel's tackle immediately after the arrival of the steamer at the port of destination, or the same may be landed and stored * * * at the expense and risk of the owner, shipper, or consignee. * * * All lighterage * * * between steamer and shore * * * will be at the risk of owner, shipper, or consignee, and also at their expense." *Held*, that the purpose of such provision was to prevent delay or inconvenience to the steamer by reason of the failure of the consignee to receive the goods at the steamer's tackle when ready for delivery, and that when he was ready and prepared to so receive them on the steamer's arrival at her anchorage the company was not authorized by such clause to lighter them at his expense and risk, and an undertaking by it to do the lighterage for a compensation agreed upon after the vessel's arrival constituted a new and separate contract.

2. SAME—CONTRACT FOR LIGHTERAGE—LOSS OF GOODS BY CARRIER.

An agreement by the owner of a vessel to lighter goods which she had contracted to deliver at her anchorage for an agreed compensation, in the absence of a stipulation otherwise therein, imposed on him the obligations of a common carrier, and as such he became responsible for all goods lost or damaged between the vessel and shore, unless such loss was occasioned by act of God or the public enemy.

**2. Usage—Evidence to Establish.**
Usage is a matter of fact, and not of opinion, and can only be established by proof of a series of acts of a similar character performed at different times by different persons.

In Admiralty.   Libel in personam to recover for loss of and damage to merchandise intrusted to respondent as a common carrier.

Page, McCutchen & Knight, for libelant.
Nathan H. Frank, for respondent.

DE HAVEN, District Judge.   There are two causes of action set forth in the libel.   In the statement of the first it is alleged that the merchandise was delivered to the defendant on board the steamer J. S. Kimball for carriage from San Francisco to the steamer's anchorage at Nome, in Alaska; that upon arrival of the J. S. Kimball at Nome the libelant and defendant entered into a further agreement by which the defendant undertook, for the agreed compensation of $5.50 per ton, to lighter such merchandise from the steamer to the beach; that by reason of the carelessness of the defendant "in and about the discharge of the said merchandise from the said steamer, and the attempted carriage thereof from the said ship to the beach," part of the merchandise was lost, and the remainder delivered to the libelant in a wet and damaged condition.   It appears from the evidence that the merchandise referred to was shipped by libelant upon the steamer J. S. Kimball for carriage from San Francisco to Nome, Alaska, under a bill of lading which contained the following, among other provisions:

"Shipped in apparent good order and condition by Ames Mercantile Co., on board the Kimball Steamship Company's steamer J. S. Kimball, * * * lying in the port of San Francisco and bound for Nome, * * * [the goods mentioned in the libel], to be carried at the option of said company upon the said steamer or upon any other of said company's steamers * * * unto the port of Nome; * * * explosions at sea or in port, or from any cause whatever, or any other accidents, literage, disasters, or dangers of the sea * * * excepted; * * * and there, in like apparent good order and condition, to be delivered at the vessel's tackles, unto Ames Mercantile Co. * * * It is expressly understood that the above mentioned merchandise shall, at the option of said Company, be received by the consignees thereof, at the vessel's tackle, immediately after the arrival of the steamer at the port of destination, or the same may be landed and stored or stored in hulks, or put in lighters, or launches, to be selected by the master of the steamer, at the expense and risk of the owner, shipper or consignee. * * * All lighterage from steamer to steamer and/or between Steamer and Shore, of goods named in this bill of lading, will be at the risk of owner, shipper, or consignee, and also at their expense at port of delivery. * * * And the said company is hereby expressly granted the right and option of delivering the merchandise represented by this Bill of Lading to consignee from alongside, or of landing and storing said merchandise either in lighters, hulks, on wharf or in warehouse, immediately upon the arrival of said steamer at the port of discharge of said merchandise without notice to and at the expense of consignee, and in the event of its so landing and storing said merchandise, said company is thereupon hereby released from all further liability for loss or damage thereafter, whether arising from fire or from any other cause."

¶ 3. Presumptions as to customs and usages, see note to Elevator Co. v. White, 56 C. C. A. 394.

Upon the arrival of the J. S. Kimball at the port of Nome the libelant was ready to accept the delivery of the goods and merchandise at the vessel's tackle, and had arranged with the North Coast Lighterage Company for the lighterage of the same from the steamer to the beach, of which fact the defendant was notified, whereupon the defendant expressed a desire to lighter the merchandise, and offered to do so upon as favorable terms as the libelant had secured from the North Coast Lighterage Company. As a result of this offer it was finally agreed that defendant should lighter the goods from the steamer, and receive for such service $5.50 per ton. Thereafter the goods were placed by the defendant on its lighter, but before they could be landed upon the beach a storm arose, and the J. S. Kimball, with the lighter in tow, steamed for Sledge Island, a short distance from, and more sheltered than, the anchorage at Nome. During the storm some of the goods were lost from the lighter, and those that remained were delivered to the libelant in a wet and damaged condition. It is claimed by the libelant that when the goods were placed on the lighter the weather was threatening, and the sea becoming rough; and that defendant was guilty of negligence not only in discharging the goods upon the lighter under such conditions of sea and weather, but also in not properly securing the goods so discharged, and not protecting the same from the rain and ocean spray. Upon consideration of all of the evidence, my conclusion is that defendant was not negligent in discharging the goods upon the lighter when it did, nor in failing to properly secure and protect the same after they were placed on the lighter. In view of this conclusion it becomes necessary to consider what obligation was assumed by the defendant in lightering the goods. The defendant insists that this service was undertaken under the option given to it by the bill of lading, and that by the terms of such bill of lading the libelant assumed the risk of any loss or damage to the goods arising from a peril of the sea after they were placed upon the lighter. This contention is based upon the following clauses found in the bill of lading:

"It is expressly understood that the above mentioned merchandise shall, at the option of said Company, be received by the consignee thereof, at the vessel's tackle, immediately after the arrival of the steamer at the port of destination, or the same may be landed and stored, or stored in hulks, or put in lighters, or launches, to be selected by the master of the steamer, at the expense and risk of the owner, shipper, or consignee. * * * All lighterage from steamer to steamer and/or between steamer and shore, or goods named in this bill of lading, will be at the risk of owner, shipper or consignee, and also at their expense at port of delivery."

I do not think this language should be construed as authorizing the Kimball Steamship Company to lighter the goods at the expense and risk of the consignee upon the arrival of its steamer at her anchorage at Nome, if the consignee was then able and willing to receive the same at the steamer's tackle when ready for delivery. The obligation assumed by the Kimball Steamship Company under the bill of lading was to carry the goods to the anchorage at the port of Nome, and the libelant agreed to accept them at the end of the steamer's tackle; and, for the purpose of preventing delay or inconvenience to the steamer, if the libelant should fail to accept the goods at the steamer's

tackle when ready for delivery, the clauses in question were inserted giving to the master of the steamer the right in that event to lighter them at the expense and risk of the consignee. But, as stated, the libelant was ready to receive the goods at the steamer's anchorage, and the defendant, not claiming any right to lighter the goods under the terms of the bill of lading, undertook, for what it deemed a reasonable compensation, to lighter the same from the steamer to the beach, under a special agreement made at that time; and its obligation under that agreement is not limited by any stipulation in the bill of lading, under which the goods were carried from San Francisco to the anchorage at the port of Nome. The goods were lightered under the new contract made at Nome, and the parties so understood it, and to that agreement alone must we look to ascertain the obligations assumed by the defendant. By the terms of that contract the defendant undertook to lighter the goods, and stipulated for no exemption, and therefore, in legal effect, took upon itself the common-law obligation of a common carrier, and as such became responsible for all goods lost or damaged between the steamer and the beach, unless such loss or damage was occasioned by the act of God or the public enemy. That a common carrier, in the absence of a special contract limiting his liability, is responsible for all losses except those occasioned by the act of God or the public enemy, is the settled rule of law. The reason upon which the rule is founded is thus stated by Best, C. J., in Riley v. Horne, 5 Bing. R. 217, 15 E. C. L. 549:

"When goods are delivered to a carrier, they are usually no longer under the eye of the owner. He seldom follows or sends any servant with them to the place of their destination. If they should be lost or injured by the grossest negligence of the carrier or his servants, or stolen by them, or by thieves in collusion with them, the owner would be unable to prove either of these causes of loss. His witnesses must be the carrier's servants; and they, knowing that they would not be contradicted, would excuse their masters and themselves. To give due security to property, the law has added to that responsibility of a carrier which immediately arises out of his contract to carry for a reward, namely, that of taking all reasonable care of it, the responsibility of an insurer. From this liability as an insurer the carrier is only to be relieved by two things, both so well known to all the country, when they happen, that no person would be so rash as to attempt to prove that they had happened when they had not, namely, the act of God and the king's enemies."

The defendant sought upon the trial to show a local usage at the port of Nome exempting persons engaged in lightering merchandise from liability for loss or damage to such merchandise occasioned solely by perils of the sea, but the evidence offered was not sufficient to establish such a usage. No witness testified to any instance in which such a usage had been recognized and acted upon by the parties interested, when goods had been lost or damaged by perils of the sea while being lightered to the beach at Nome. Two witnesses stated generally that there was such a usage; but one seems to have based his statement upon the fact that he had previously entered into an agreement with the North Coast Lighterage Company to do lighterage for him, in which it was agreed that the lighterage company was not to be liable for damage or loss of goods while in transit from the ship to the shore; and the other, upon conversation he had had

with persons engaged in the business of lightering, in which he was informed by them that they would not be responsible for loss or damage occasioned by perils of the sea. This evidence is certainly not sufficient to establish a usage. "Usage is a matter of fact, not of opinion. Usage of trade is a course of dealing; a mode of conducting transactions of a particular kind. It is proved by witnesses testifying of its existence and uniformity from their knowledge obtained by observation of what is practiced by themselves and others in the trade to which it relates." Haskins v. Warren, 115 Mass. 535. And in Duer on Ins., vol. 1, p. 182, it is said:

"The existence of a usage, whatever may be the nature of the subject to which it relates, is in all cases a fact; a complex fact, it is true, resulting from a variety and a succession of individual acts, but still a fact, to be proved like all other facts, by the testimony of witnesses speaking from their personal knowledge. It is not created by hypothetical opinions, but by actual practice, and can only be established by a series of acts of similar character and import, performed at different times, by different persons. It is to these acts that the testimony, properly restrained and directed, should be strictly confined, and it is upon their number, uniformity, and notoriety that the weight and value of the evidence depend. Hence, where a witness swears generally that a particular usage exists, yet is unable to state from his own knowledge any instance of its actual observance, his testimony should at once be rejected; and it is only by a strict adherence to this rule that the important distinction between the evidence of opinions and belief and that of fact is possible to be maintained."

See, also, Mills v. Hallock, 2 Edw. Ch. 652; The John H. Cannon (D. C.) 51 Fed. 46; Hall v. Benson, 7 C. & P. 711, 32 E. C. L. 835; Hamilton v. Nickerson, 13 Allen, 351.

It is also alleged in the answer, as a defense to the first cause of action set out in the libel, that an account was stated between the libelant and respondent, "and that the said claim of said libelant for damage and shortage in said libel set forth was then and there by mutual consent between the parties fully settled, and the said respondent fully discharged from any further claim by reason thereof." This defense is not sustained by the evidence.

In relation to the second cause of action set out in the libel, it seems to have been conceded upon the hearing that the defendant is liable for whatever damages the libelant may have sustained by reason of the matters therein charged. It follows from what has been said that the libelant is entitled to recover damages sustained by him by reason of the matters alleged in the libel, and the case will be referred, with directions to ascertain and report to the court the amount of such damages.